**COLE SCHOTZ P.C.**
Court Plaza North
25 Main Street, P.O. Box 800
Hackensack, New Jersey 07602-0800
Michael D. Sirota, Esq.
David M. Bass, Esq.
(201) 489-3000
(201) 489-1536 Facsimile
Attorneys for Modan Associates

| | |
|---|---|
| In re:<br><br>ROSEVILLE SENIOR LIVING PROPERTIES, LLC,<br><br>Debtor. | UNITED STATES BANKRUPTCY COURT<br>FOR THE DISTRICT OF NEW JERSEY<br>CASE NO. 13-31198 (MBK)<br><br>Chapter 11<br><br>Hearing Date: September 29, 2016, at 10:00 a.m. |

**LIMITED OBJECTION OF MODAN ASSOCIATES TO PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

Modan Associates ("Modan"), the largest non-insider equity interest holder in Roseville Senior Living Properties, LLC (the "Debtor" or "Roseville"), by and through its undersigned counsel, hereby files this Limited Objection (the "Limited Objection") to the *Plan of Liquidation Under Chapter 11 of the United States Bankruptcy Code* [Docket No. 693] (the "Plan") filed by Stephen V. Falanga, chapter 11 trustee (the "Trustee") for the Debtor's bankruptcy estate, and in support thereof, respectfully states as follows:

**PRELIMINARY STATEMENT**

1. Modan does not object to the Trustee's confirmation of a plan in this case. Indeed, Modan applauds the Trustee for his efforts in selling the Debtor's facility and enabling equity holders to receive a distribution on account of their interests after the Debtor and those in control of the Debtor, including Michael Edrei ("Edrei"), Meecorp Capital Markets, LLC ("Meecorp"), ran roughshod over the rights of those non-insider equity holders (of whom Modan is the largest one).

54465/0001-13576903v1

2. However, Modan does object to the release provisions in the Plan. Those provisions are extremely cumbersome, difficult to follow and unnecessarily broad in scope. While Modan has no issue with the Trustee and his professionals being "released" (which presumably could be accomplished solely through the exculpation provision), Modan does not understand why anyone else should fall under the release umbrella. Indeed, given the breadth of the drafting, it could easily be argued that the releases would extend to Edrei and others close to him, including Meecorp. The Trustee has assured Modan that was not the Plan's intention.

3. Accordingly, Modan respectfully requests that, if the release provisions are not stricken in their entirety, any order confirming the plan include language that makes it abundantly clear that nothing in the Plan is intended to provide a release or exculpation to Edrei or anyone acting in concert with him, including Meecorp and M-Capital, and that no party be precluded from bringing or asserting any claim against them as a result of the Debtor's bankruptcy case.

**RELEVANT FACTUAL BACKGROUND AND PROCEDURAL HISTORY**[1]

4. Prior to the Petition Date (as defined below), Modan was a participant in a mezzanine loan initiated by Meecorp to the predecessor owner/operator of the Debtor's facility. When those borrowers defaulted, and Meecorp foreclosed upon the facility, Modan's participation interest in the loan was converted to a membership interest in the Debtor. As

---

[1] The Court is well acquainted with Edrei's failings in managing the debtor-in-possession and Modan's involvement in this case, and Modan will refrain from citing the entire factual and procedural history of its involvement and efforts in the Chapter 11 Case. A more fulsome description of the applicable factual and procedural history is set forth in the *Motion for Allowance and Payment of an Administrative Expense Claim of Modan Associates Pursuant to 11 U.S.C. §§ 503(b)(3)(D) and 503(b)(4)* [Docket No. 454] (the "Modan Substantial Contribution Motion"), which is incorporated herein by reference. Capitalized terms not otherwise defined herein shall be given the meanings ascribed to them in the Modan Substantial Contribution Motion. Because all of the facts set forth herein are derived from the record of this Chapter 11 Case, Modan has not submitted a separate Certification. The execution of this Objection by counsel shall be considered or deemed to be a certification of the facts supporting the relief requested.

2

54465/0001-13576903v1

reflected on Exhibit A to the Plan, Modan holds 8.735% of the membership interest in the Debtor.

5. On September 27, 2013 (the "Petition Date"), on the eve of a foreclosure sale, the Debtor filed the Chapter 11 Case. No committee of unsecured creditors or equity holders was ever appointed in the Chapter 11 Case.

6. After more than two years under the control of Edrei/Meecorp in this Chapter 11 Case, on October 6, 2015, Modan filed the *Motion for the Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. §§ 1104(a)(1) and 1104(a)(2)* [Docket No. 389] (the "Trustee Motion"). In the Trustee Motion, Modan asserted that (1) cause existed under § 1104(a)(1) for the appointment of a trustee and (2) appointment of a trustee was in the best interests of creditors under § 1104(a)(1). *See id.*

7. Among other things, in the Trustee Motion, Modan asserted as follows:

- "Putting aside his long history of exploiting the Debtor on the backs of the equity investors, Edrei appears incapable at this point to usher this case through to a conclusion that is fair and equitable to all parties in interest. Certainly, none of the parties in interest in this case, whether it is the equity holders or CapitalSource, have any confidence in Edrei to do so. ¶ 9;

- There is no credible reason for this asset to be under the sole control of Edrei when an open and transparent 363 sale process can protect the interests of all parties and the integrity of the Bankruptcy Court." ¶ 9;

- "Edrei's continued involvement in the management of the Debtor confers no conceivable benefit to the estate and serves no other purpose other than to entrench Edrei and afford him the means to advance his own, narrow agenda of personal asset gain and preservation – at the expense of the innocent equity holders such as Modan. Only the immediate appointment of a trustee can ensure that such misconduct and loss of value of the Debtor's estate will not continue in the Chapter 11 Case." ¶ 11;

- "Edrei's track record in managing the Debtor speaks for itself; his continued participation in managerial affairs is of no value to this estate. Due to Edrei's complete lack of credibility among key constituents, he is in no position to any longer add value to plan discussions and, instead will

3

be an obstacle to any meaningful dialogue aimed at a consensual restructuring.  On the other hand, the appointment of an independent trustee, who can facilitate a transparent 363 sale process or consider other plan options, is best equipped at this point in the Chapter 11 Case to help protect the interests of all parties and the integrity of the Bankruptcy Court.  Moreover, Edrei's continued presence will call into question the integrity and fairness of any investigation into Edrei's conduct and financial affairs." ¶ 63;

- "Alternatively, this Court should order the appointment of a trustee because it is in the best interests of *all parties*." ¶ 64 (emphasis added).

8. Modan requested that the hearing on the Trustee Motion be expedited and held in conjunction with the reopened confirmation hearing (on October 19), because of its concern that prompt relief was necessary to avoid the risk of further harm to the estate.  The Court granted Modan's request for an expedited hearing and, in fact, scheduled the hearing on the Trustee Motion to *precede* confirmation, as the Court determined that granting the Trustee Motion would obviate/moot the need to consider confirmation of the Debtor's plan.

9. On October 19 and 20, 2015, the Court held an evidentiary hearing on the Motion to Appoint a Trustee.  Edrei was the only witness to testify at that hearing.  As a result of Modan's filing and prosecution of the Trustee Motion, certain issues came to light which guided the Court in determining to appoint a Chapter 11 trustee.  For example, Edrei's testimony during the hearing confirmed or revealed the following:

- That he believed he had no fiduciary duty and that the operative operating agreement actually excused him from exercising any fiduciary duty.  *See* Tr., Oct. 19, at 19:7-21:5; 36:6-37:8.

- That he negotiated with himself the various and expenses that he paid or sought to pay himself and affiliates and saw no conflict in doing so.  *See* Tr., Oct. 19, at 27:14-28:4; 29:16-29:21; 46:8-47:2; 70:24-72:19.

- That he refused to investigate or value potential claims asserted by the Other Objecting Equity Holders in the New Jersey State Court regarding malfeasance by Edrei and affiliates, including Meecorp.  *See* Tr., Oct. 19, at 31:24-43:6.

4

- That Edrei/Meecorp failed to keep the equity holders reasonably apprised of the activities of the company over the more than 2 years the Debtor was in Chapter 11. *See* Tr., Oct. 19, at 26:1-27:13.

- That the Debtor never sought, or obtained approval, for the retention of the broker who it sought to pay $225,000 in connection with the approval of the Thorofare exit facility. *See* Tr., Oct. 19, at 49:10-50:2.

- That, despite testifying that he had negotiated the terms of the Thorofare loan, Edrei was unaware that the proposed Thorofare loan would potentially subject the Debtor to a 10.5% exit fee if there had been a default under the loan – even if that default had been cured, and, contrary to his testimony in the Second Edrei Confirmation Declaration, the terms thereof required further negotiation. *See* Tr., Oct. 19, at 55:1-61:11; 117:2-24.

- That, by executing the limited non-recourse carveouts guaranty, Edrei would be disincentivized to file a subsequent bankruptcy for the debtor. *See* Tr., Oct. 19, at 62:25-63:5.

- That Duane Morris acted as counsel for both the Debtor and Edrei/Sharon Edrei as guarantors under the proposed Thorofare loan. *See* Tr., Oct. 19, at 63:18-64:5.

- That the Debtor received an offer for $41 million to acquire the Debtor's property, and that despite the impending foreclosure of the property, Edrei advised the offeror that the Debtor would not accept any offer from the buyer and would not consider any offer until after the bankruptcy.

- That Edrei had no idea why the MidCap financing did not close, and that he never received a letter from MidCap identifying the reason the MidCap financing did not close, *see* Tr., Oct. 19, at 121:17-25; *see also* Tr. Oct. 20, at 19:14-24:24; 28:22-29:20, despite that he did, in fact, receive the MidCap Declination Letter which specified the reasons for why the MidCap financing did not close.

- That Edrei was seeking the "guaranty fee" to "recoup" his losses relating to a $3.3 million deficiency judgment against him with respect to a guaranty for an unrelated Meecorp matter. *See* Tr., Oct. 20, at 79:3-5.

- That despite Edrei's affiliates and other family members being equity holders, he would not cooperate with a chapter 11 trustee if one were appointed. *See* Tr., Oct. 20, at 103:13-15; 128:4-129:2.

5

10. At the conclusion of the hearing on the Trustee Motion, the Court granted Modan's motion. The Court issued its decision on the record. Among other findings, this Court determined as follows:

- "Simply put, the Court has lost confidence in current management and its decision making."

- "Number 1, the Court is disturbed by current management's decision to pursue the current plan bottomed on a refinance which Mr. Edrei acknowledges is an expensive proposition. . . . So while the refinance may be expedient, it is certainly not in the Court's view the most cost effective option in lieu of a sale, which would have to occur by the very nature of the refinance and the testimony given that a sale would need to occur in short order."

- "The proposed transaction under the plan includes a bad boy guarantee which substantially reduces the options of the debtor in the event of a default."

- "notwithstanding that yesterday was scheduled as the confirmation hearing on the plan premised on this refinance, there was still only a non-binding commitment with substantial terms to be negotiated. Indeed, there was a multi-million dollar default provision which caught the principal by surprise."

- "The Court cannot ignore the fact that the proposed loan gives rise to nearly $800,000 fee to Mr. Edrei for a limited non-recourse guarantee with the fee being paid to an affiliated entity that is not giving the guarantee. The Court recognizes the conflict that's been identified by the U.S. Trustee here with respect to and others the lack of independent review and negotiation of that fee."

- "current management has received and chosen to put aside an offer of $41 million for property, notwithstanding that the clock is ticking on the lender's foreclosure that this Court previously granted stay relief"

- "Other facts the Court has taken into account in reaching its decision . . . [are] most importantly a lack of candor and credibility arising from the testimony and actions of Meecorp's principal."

- "The Court found it stunning when Mr. Edrei testified he never asked why MidCap didn't close. A loan, which supported the initial confirmation effort, confirmed initially by this Court, that was initiated in January of 2014, suddenly is withdrawn and the principal never deemed it appropriate

6

- "to ask MidCap why. It's not simply not credible, and if it is the truth, it reflects poor judgment, poor management."

- "Mr. Edrei's failure to acknowledge or recognize that he and Meecorp owed fiduciary duties to other members of the debtor, as well as the reporting obligations is disturbing for continued faith in current management."

- "Mr. Edrei's insistence that sales in bankruptcy cannot maximize value, notwithstanding no direct experience, is alarming as an election not to pursue a sale in the context of a bankruptcy and I believe his quote was, would not accept an offer until after bankruptcy, reflects a narrow view of the options available and may serve to -- as a disservice to parties in interest, including equity holders and creditors."

- "The Court also has taken into account that certain recent actions -- taken into account certain recent actions, such as the initiation of debtor's dissolution without court approval, the retention of a loan broker without court approval."

- "And probably most disturbing are the inaccurate and false communications to other equity members regarding marketing efforts and the status of the bankruptcy proceeding and the pending foreclosure. One e-mail placed into evidence included a statement upon request to rescind a consent to dissolve and sale that Mr. Edrei could not agree -- cannot -- that the equity holder cannot rescind a consent which was relied upon. Well, I don't know what reliance there could have been at that juncture. It just amplifies, reflects inaccuracies."

- "The Court also must question management's decision to spend time and money on the refinance loan with, as I've indicated, the clock ticking on a foreclosure sale where the loan itself requires a non-appealable final order, yet there must be substantial risk or there may be substantial risk of an appeal of any confirmation order."

11. The Court concluded its findings with the following observation:

    Finally, the Court can no longer and should no longer ignore the palpable conflicts of interest in this case where management elects to pursue options which give rise to substantial personal financial benefits, such as fees and commissions and cast aside its obligation to examine allegations, simply examine allegations raised against current management.

12. As a result of the Court's ruling on the Trustee Motion, the Court declined to hold a hearing on confirmation of the Debtor's plan, instead adjourning the confirmation hearing to

7

54465/0001-13576903v1

enable the to-be-appointed chapter 11 trustee the opportunity to review it and determine how best to proceed. (That plan would ultimately be withdrawn without prejudice by the Debtor).

13. On October 22, 2015, the Court entered an *Order Directing Appointment of a Chapter 11 Trustee* [Docket No. 419]. Shortly thereafter, Stephen V. Falanga, Esq. was appointed chapter 11 trustee. *See* Docket Nos. 425, 426.

14. On July 12, 2016, the Trustee filed the Plan.

15. The Plan contains unnecessarily broad "Releases and Related Provisions" in Article XII which are, to say the least, extremely difficult to parse and indeed nearly impossible to understand exactly who is intended to benefit from the release.

16. By way of reference, § 12.04 of the Plan, captioned "Third-Party Release," for example, goes on for nearly three (3) full pages in the Plan document. It provides as follows:

> **12.04 Third-Party Release**
>
> **Effective as of the Effective Date, and except for those obligations arising out of the Plan, each Holder of a Claim, CapitalSource, each of the CapitalSource Parties, each of the Non-CapitalSource Released Parties, the Debtor, each of the Equity Security Holders, all equity holders, interest holders, managers, members and directors of the Debtor, each of the Meecorp Equity Holders, Meecorp, Meecorp Group LLC and Edrei, each on behalf of himself or itself, as the case may be, and each on behalf of their respective directors, successor-in-interest, successors-by-merger, parents, predecessors, affiliates, employees, agents, representatives, assigns and/or administrators and each of their respective predecessors, successors, assigns, heirs and executors (together with each Holder of a Claim, CapitalSource, each of the CapitalSource Parties, each of the Non-CapitalSource Released Parties, the Debtor, the Equity Security Holders, all equity holders, interest holders, managers, members and directors of the Debtor, the Meecorp Equity Holders, Meecorp, Meecorp Group LLC and Edrei, the "Releasing Parties" and each a Releasing Party"), as applicable, shall be deemed to have jointly and severally, knowingly, voluntarily, intentionally, conclusively, absolutely, unconditionally, irrevocably, and**

8

**forever waived, released and forever discharged the Estate, Trustee, the Trustee's Professionals, and their respective property, employees, owners, agents, representatives, insurers, successors and assigns (the "Released Parties"), of and from any and all actual or potential claims, demands, damages, actions, requests for sanctions and causes of action, torts, obligations, suits, debts, controversies, damages, judgments, executions, claims and demands whatsoever, all other liabilities whether known or unknown, matured or unmatured, contingent or absolute, of any kind or description whatsoever, either in law or in equity, including, without limitation, under the United States Bankruptcy Code or otherwise asserted or unasserted, that each Releasing Party ever had, now has, claims to have or may later have against the Released Parties, or any of them, upon or by reason of any manner, cause, causes or thing whatsoever, including, without limitation, any presently existing claim or defense whether or not presently suspected, contemplated or anticipated, based in whole or in part on any act, omission, transaction, agreement, event or occurrence taking place on or prior to the Effective Date in any way relating to the Estate, the Trustee, the Debtor, the Plan, the Sale, the Equity Security Holders, each Holder of a Claim, all equity holders, interest holders, managers, members and directors of the Debtor, Meecorp, Meecorp Group LLC, Edrei, the Meecorp Equity Holders, the Chapter 11 Case, the CapitalSource Secured Claim, the Claim (as that term is defined in the CapitalSource Settlement Agreement), the Allowed Claim (as that term is defined in the CapitalSource Settlement Agreement), the Debtor's Property (as that term is defined in the CapitalSource Settlement Agreement), the Liens (as that term is defined in the CapitalSource Settlement Agreement), the CapitalSource Adversary Proceeding, the Roseville Case, the Cross-Complaint, the Judicial Foreclosure (as that term is defined in the CapitalSource Settlement Agreement), the Subordination Agreement, the Breach of Subordination Agreement Action (as that term is defined in the CapitalSource Settlement Agreement), the Trustee Sale (as that term is defined in the CapitalSource Settlement Agreement), the CapitalSource Foreclosure Sale, and the CapitalSource Settlement Agreement (except for those obligations arising out of the CapitalSource Settlement Agreement) (collectively, the "Third Party Release"). Notwithstanding anything to the contrary in the foregoing, the Third-Party Release shall not release any obligation of any party under the Plan or any document, instrument, or**

9

> **agreement executed in furtherance of or to implement the Plan.**
>
> **Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) in exchange for good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims, liabilities and other obligations released by the Third-Party Release; (3) in the best interests of the Estate and all Holders of Allowed Claims and Allowed Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any claim, cause of action or other liability or obligation released pursuant to the Third-Party Release; and that, effective as of the Effective Date, each of the Released Parties shall be deemed absolutely, unconditionally, irrevocably, and forever discharged and released by the Releasing Parties, as set forth in the Third-Party Release.**

Plan, § 12.04 (emphasis in original).

17. Read literally, that provision could be construed to include, among others, Edrei, Meecorp and others acting in concert with them.

18. More specifically, the Plan defines "Estate" as "the estate created upon the commencement of the Chapter 11 Case pursuant to section 541 of the Bankruptcy Code." *See* Plan at § 2.44. The "Third-Party Release" provision seeks to include, as "Released Parties" who are intended to receive the broad "Third-Party Release", not only the "the Estate" but also the Estate's "employees, owners, agents, representatives," among others. *See* Plan, § 12.04. Modan presumes Edrei, Meecorp and those affiliated with them, would take the position that they are, in fact, "employees, owners, agents, or representatives" of "the Estate."

19. Shortly after the Plan was filed, Modan raised its concerns regarding the breadth of the "Releases and Related Provisions" in Article XII and in particular that it could be read to

10

include Edrei and Meecorp within the ambit of those identified as "Released Parties". Counsel for the Trustee assured Modan that there is no release intended for Edrei, Meecorp or any of their affiliates, agents, representatives, etc. (whether from the Debtor and its estate, the Trustee or from any third party, including equity holders).

20. In connection with those discussions, counsel for the Trustee also advised Modan that Richard M. Meth, Esq., counsel for certain other equity holders, raised similar concerns regarding the scope of the "Releases and Related Provisions".

21. Recently, Mr. Meth requested, on behalf of his clients and Modan, that the Trustee include in any proposed/submitted Order confirming the Trustee's Plan, the following provision (which had previously been approved by Modan):

> IT IS FURTHER ORDERED that, notwithstanding anything to the contrary contained in (i) the Plan, including but not limited to Sections 12.02 and 12.04 thereof, (ii) this Order, or (iii) any of the proceedings had in this bankruptcy case or any related proceedings, nothing in the Plan, in this Order, or in any related proceedings shall be, is intended to be, or shall be deemed or construed to be, or to provide, (A) a release, exculpation, waiver of, or limitation upon, any claims, causes of action, legal proceedings, or rights of the Roseville bankruptcy estate, or of any of the Equity Holders, Modan Associates, or any other equity holders of Roseville against MeeCorp, any of MeeCorp's Equity Holders, MeeCorp Group, LLC, Edrei and/or any of their respective directors, successors-in-interest, successors by merger, parents, relatives, predecessors, affiliates, employees, agents, representatives, assigns and/or administrators, or (B) a release, exculpation, waiver of, or limitation upon, any obligations or liabilities of MeeCorp, any of MeeCorp's Equity Holders, MeeCorp Group, LLC, Edrei and/or any of their respective directors, successors-in-interest, successors by merger, parents, relatives, predecessors, affiliates, employees, agents, representatives, assigns and/or administrators to the Roseville bankruptcy estate or to any of the Equity Holders, Modan Associates, or any other equity holders of Roseville; and

22. While Modan understands that the Trustee is amenable to including this (or substantially similar) language in any confirmation order, the Trustee suggested that, as a

precursor to doing so, Modan and the other equity holders each file a limited objection to the Plan expressing the concerns with the potential interpretation of the "Releases and Related Provisions" so that everyone would be put on notice of those concerns/objections.

23.     In taking the Trustee up on his suggestion, Modan files this Limited Objection.

## ARGUMENT

24.     Section 524(e) of the Bankruptcy Code explicitly states that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). In *Continental Airlines*, the Third Circuit Court of Appeals rejected a broad, non-consensual release and injunction provision in the debtors' plan of reorganization. The plan provision under consideration in *Continental Airlines* released and permanently enjoined certain securities lawsuits by class action plaintiffs against the debtors' officers and directors. The Third Circuit held that the release and permanent injunction in the debtors' plan did not "pass muster under even the most flexible tests for validity of non-debtor releases." *Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 214 (3d Cir. 2000).

25.     The Third Circuit, however, declined to specifically define when non-debtor releases are permissible. Instead, the Court noted that there are three "hallmarks of permissible non-consensual releases – fairness, necessity to the reorganization, and specific factual findings to support these conclusions." *Id. See also In re Lower Bucks Hosp.*, 571 F3d. Appx. 139, 144 (3d Cir. 2014) (affirming bankruptcy court decision denying third party release that could not satisfy these criteria). The *Continental* court concluded that each of these factors was absent in that case, concluding that the proposed releases under the *Continental* plan were not fair or necessary because:

    (i)    the plan provided no consideration to plaintiffs in exchange for having their prepetition claims against officers and directors under the securities laws permanently enjoined;

12

(ii) the releases granted to such parties were not necessary to the debtor's reorganization when the released parties did not show a critical financial contribution to make the plan feasible or that litigation was a threat to the reorganized debtor; and

(iii) the debtors' obligation to indemnify its officers and directors did not transfer the release and permanent injunction of plaintiffs' claims against non-debtor officers and directors into a "key element" of the reorganization.

203 F.3d at 215-216.

26. Based on the few cases in which releases of non-debtors have been upheld in the Third Circuit, as summarized in *Continental Airlines,* the Third Circuit reflected that nonconsensual releases have been found to be valid only "in the context of extraordinary cases." *Id.* at 212. As the Third Circuit recognized, provisions which amount "to nothing more than a lockstep discharge of non-debtor liability . . . fall squarely into the section 524(e) prohibition." *Id.* at 217.

27. Interpreting *Continental Airlines,* bankruptcy courts in this Circuit have specifically recognized that "extraordinary circumstances [are] required to meet even the most flexible test for third party releases." *In re Genesis Health Ventures, Inc.,* 266 B.R. 591, 608 (Bankr. D. Del. 2001). The *Genesis* court noted that "financial restructuring plans" do not generally present such extraordinary circumstances as non-consensual release provisions sometimes approved in mass tort cases. *Id.*

28. Moreover, bankruptcy courts in this Circuit have developed a four factor test to assess whether "extraordinary" circumstances exist to permit non-consensual releases, including: (i) the non-consensual release is necessary to the success of the reorganization; (ii) the releasees have provided a critical financial contribution to the Debtor's plan; (iii) the releasees' financial contribution is necessary to make the plan feasible; and (iv) the release is fair to the non-consenting creditors, *i.e.*, whether the non-consenting creditors received reasonable

13

compensation in exchange for the release. *See In re Exide Tech.*, 303 B.R. 48, 75 (Bankr. D. Del. 2003) (citing *Genesis Health Ventures*, 266 B.R. at 607-08); *U.S. Bank Nat'l Assoc. v. Wilmington Trust Co. (In re Spansion, Inc.)*, 426 B.R. 114, 144 (Bankr. D. Del. 2010) (same).

29. With all due respect to the Trustee, none of these factors have been – or can be – satisfied here for any party.

30. Thus, Modan submits that any language in the Plan that may be interpreted to enjoin any claims against, or to in effect grant a release to any third party, with respect to claims held by non-debtors is unfair, unnecessary and violates the governing law in the Third Circuit. And in that regard, Modan submits that sections 12.04 and 12.05 should indeed be deleted in their entirety (with the Trustee and his professionals "released" through the "Exculpation" in § 12.02).[2]

31. To be clear, however, Modan has no objection to the release of liability in favor of the Trustee and his professionals (as well as the Estate) to the extent the Trustee believes that relief is necessary (provided that anyone being released is identified specifically in the confirmation order, *e.g.*, all employees of Walsh Pizzi O'Reilly Falanga LLP).

32. Suffice it to say, however, for the reasons highlighted above and well known to this Court, there should be no question that neither Edrei, Meecorp nor any one acting in concert with them, should receive the benefit of anything in the "Releases and Related Provisions." Accordingly, Modan respectfully submits that it needs to be made abundantly clear that no

---

[2] The "CapitalSource Release" in § 12.05 of the Plan, is, frankly, incomprehensible. For example, it is almost impossible to understand who is intended to be releases and any distinction between "CapitalSource Parties" and the "Non-CapitalSource Released Parties." Modan understands that persons or entities that may be "CapitalSource Parties" and/or "Non-CapitalSource Released Parties" have already been released by the Debtor and the Estate (through the Trustee) and Modan has no objection to that release being incorporate so that those parties are "released" under the Plan. However, Modan submits that can be accomplished more easily by simply incorporating the prior release into the confirmation order, rather than through the vague, overreaching provision currently in the Plan.

provision of the plan shall, or shall be deemed to, release or exculpate Edrei, Meecorp or any one acting in concert with them in any way.  In that regard, Modan requests that the language proposed by counsel for the other equity holders (as identified in paragraph 21 above) be included in any order confirming the Plan.

## CONCLUSION

For the reasons set forth above, Modan respectfully requests that this Court (i) deny confirmation of any plan to the extent in conflict with this Limited Objection and (ii) grant Modan such other and further relief as this Court deems just and proper.

DATED: September 19, 2016

                                          Respectfully submitted,

                                          **COLE SCHOTZ P.C.**

                                          By:   */s/ David M. Bass*
                                                  Michael D. Sirota
                                                  David M. Bass

                                          *Attorneys for Modan Associates*